STATE v. GEORGE BLASIUS.[1]

December 9, 1932.

No. 29,017.

[1]Reported in 245 N. W. 612.

D. L. *Grannis*, for appellant.

H. E. *Stassen*, County Attorney, and *Charles P. Stone*, for the state.

LORING, J.

This is an appeal from a judgment for personal property taxes levied upon 11 head of cattle at the South St. Paul stockyards and upon a membership in the Traders Livestock Exchange operating at those yards.

The defendant is a trader registered under the federal packers and stockyards act, dealing in the buying and selling of cattle at the South St. Paul yards. The cattle in question came to the yards and were there present and owned by defendant on the first day of May, 1929. Part of them were sold on that day and part on the following day and were immediately shipped to their purchasers at points outside the state. The defendant contends that these cattle when in the yards on May 1 were in the flow or current of interstate commerce, and that consequently a personal property tax levied on them as of the first day of May is a burden upon interstate commerce and that the state taxing power must yield to the paramount interests of that commerce. He also contends that the membership in the exchange is not taxable property.

The first branch of the case dealing with the taxability of the cattle presents the more difficult problem and one not free from doubt. The crucial question to be settled in determining whether personal property moving in interstate commerce is subject to local taxation is that of its continuity of transit. Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. ed. 626. The rule is a simple one, but in the light of the decisions a very difficult one to apply. As here presented it becomes a question whether or not the

422

business done in the stockyards between the receipt of the livestock and its shipment therefrom is a part of interstate commerce and the property involved exempt from the burden of local taxation. In matters of this character involving the powers of congress under the commerce clause we are of course controlled by the views of the Supreme Court as expressed upon issues presented to it. If we were to be guided by that court's expressions in such cases as Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. ed. 615; American S. & W. Co. v. Speed, 192 U. S. 500, 24 S. Ct. 365, 48 L. ed. 538; and General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754, we would have no hesitation in holding that the cattle in transit through the South St. Paul yards, there unloaded and fed, bought, and sold by dealers, had sufficiently come to rest to be subject to local taxation. In the light of those cases, we should say that the interstate journey of these cattle was as much interrupted by the course of business at the stockyards as was the grain in Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. ed. 615; the merchandise in the American S. & W. Co. case, 192 U. S. 500, 24 S. Ct. 365, 48 L. ed. 538; or the petroleum products in the Crain case, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754.

In Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. ed. 615, the grain had been purchased in the south and had been shipped by way of Chicago to eastern points, with the right to remove it from the cars at Chicago to the private grain elevator belonging to the owner of the grain. There it was inspected, weighed, cleaned, clipped, dried, sacked, graded, or mixed, and again delivered to the carriers for destinations in other states. The question there presented was whether the removal of the grain to the private elevator interrupted the continuity of the transportation and made the grain subject to local taxation. It was held that it did, and that the grain was locally dealt with in the interest of the owner while it was in his custody and was subject to his complete disposition for a collateral business purpose of his own.

In the American S. & W. Co. case, 192 U. S. 500, 24 S. Ct. 365, 48 L. ed. 538, the merchandise was shipped from points outside the

state to Memphis, there placed in a warehouse and again sorted and allocated to destinations outside the state of Tennessee. It was held that the continuity of the journey was sufficiently interrupted to subject the merchandise to local taxation. In the Crain case, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754, oil was shipped, from outside the state to Memphis, where it was placed in tanks of various sizes, from which the oil was put in barrels or other small containers to be sold locally or in other states or to fill orders already received from customers without the state. It had certain tanks in which the oil which had been already sold to customers in Arkansas, Louisiana, and Mississippi was placed and so marked. It was held that the separating of the oil into various and different containers was itself a local business in Memphis and that its subsequent shipment made a separate interstate shipment, thus interrupting the interstate journey and permitting local taxation.

The Crain case, 209 U. S. 211, 28 S. Ct. 475, 52 L. ed. 754, was by a divided court with a very vigorous dissent. The comment made upon that case by the same court in the case of Carson Petroleum Co. v. Vial, 279 U. S. 95, 105, 49 S. Ct. 292, 73 L. ed. 626, indicates that the case, while not specifically overruled, is not considered to be of controlling weight at present. In fact, as stated in the Carson Petroleum Co. case, 279 U. S. 95, 106, 49 S. Ct. 292, 73 L. ed. 626, there has been a liberal construction of what is continuity of the journey, in cases where the court finds from the circumstances that export trade has been actually intended and carried through. There seems to us to be a distinct trend in the decisions of the Supreme Court toward a more liberal construction of what constitutes interstate commerce and toward the exemption from local taxation of property in the current of that commerce. In the case of Swift & Co. v. U. S. 196 U. S. 375, 398, 25 S. Ct. 276, 280, 49 L. ed. 518, the court said:

"Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one State, with the expectation that they will end their transit, after purchase, in another,

and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the States, and the purchase of the cattle is a part and incident of such commerce."

This case was followed by Stafford v. Wallace, 258 U. S. 495, 517, 42 S. Ct. 397, 402, 66 L. ed. 735, 23 A. L. R. 229, in which the court had under consideration the validity of the packers and stockyards act regulating traffic through stockyards. The court said [258 U. S. 515]:

"The stockyards are not a place of rest or final destination. Thousands of head of livestock arrive daily by carload and trainload lots, and must be promptly sold and disposed of and moved out to give place to the constantly flowing traffic that presses behind. The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current from the West to the East, and from one State to another. Such transactions cannot be separated from the movement to which they contribute and necessarily take on its character. The commission men are essential in making the sales without which the flow of the current would be obstructed, and this, whether they are made to packers or dealers. The dealers are essential to the sales to the stock farmers and feeders. The sales are not in this aspect merely local transactions. They create a local change of title, it is true, but they do not stop the flow; they merely change the private interests in the subject of the current, not interfering with, but, on the contrary, being indispensable to its continuity. The origin of the livestock is in the West, its ultimate destination known to, and intended by, all engaged in the business is in the Middle West and East either as meat products or stock for feeding and fattening. This is the definite and well-understood course of business. The stockyards and the sales are necessary factors in the middle of this current of commerce."

See also the case of Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 42 S. Ct. 101, 66 L. ed. 227, where the state of West Virginia

sought to impose a tax of two cents a barrel on oil piped from the state to outside points through storage tanks, from which the owner might divert it if desired to points within the state. The court held that the oil actually carried out of the state was exempt from the tax as being in interstate commerce while in the tanks and pipes.

It is quite true that the interstate commerce clause of the constitution does not give immunity to movable property from local taxation which is not discriminative unless it is in actual continuous transit in interstate commerce. Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. ed. 309, 25 A. L. R. 1195. But quite clearly the Supreme Court regards the passage through the stockyards and the transfer and temporary holding of title therein by the registered dealers as an essential part of the continuity of the transit of the cattle in interstate commerce from west to east. That court does not seem to consider as important the fact that a part of the property flowing in interstate commerce may be diverted from that commerce to intrastate destinations. In the case of United F. G. Co. v. Hallanan, 257 U. S. 277, 42 S. Ct. 105, 66 L. ed. 234, natural gas was piped from West Virginia points to points outside the state, but might be diverted at storage points to places within the state according to the desire of the owner of the gas. The court said [257 U. S. 281]:

"In short, the great body of the gas starts for points outside the State and goes to them. That the necessities of business require a much smaller amount destined to points within the State to be carried undistinguished in the same pipes does not affect the character of the major transportation. Neither is the case as to the gas sold to the three companies changed by the fact that the plaintiff, as owner of the gas, and the purchasers after they receive it might change their minds before the gas leaves the State and that the precise proportions between local and outside deliveries may not have been fixed, although they seem to have been. The typical and actual course of events marks the carriage of the greater part as commerce among the States and theoretical possibilities may be left

out of account. There is no break, no period of deliberation, but a steady flow ending as contemplated from the beginning beyond the state line." Citing cases.

See also Eureka Pipe Line Co. v. Hallanan, 257 U. S. 265, 272, 42 S. Ct. 101, 103, 66 L. ed. 227, where the court said:

"As has been repeated many times, interstate commerce is a ·practical conception, and, as remarked by the court of first instance, a tax to be valid 'must not in its practical effect and operation burden interstate commerce.' It appears to us as a practical matter that the transmission of this stream of oil was interstate commerce from the beginning of the flow, and that it was none the less so that if different orders had been received by the pipe line it would have changed the destination upon which the oil was started and at which it in fact arrived."

In the light of the views expressed by the Supreme Court in Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. ed. 735, 23 A. L. R. 229, and in the Swift & Co. case, 196 U. S. 375, 25 S. Ct. 276, 49 L. ed. 518, it is our opinion that the learned trial court erred in holding that these cattle had sufficiently come to rest to subject them to the taxing power of this state; and in so far as the judgment relates to the taxes upon the cattle it is reversed.

■ The second question is whether or not the membership in the Traders Livestock Exchange is personal property and taxable. Though the membership in the traders exchange is not so valuable and does not confer so many privileges as did the membership of the Duluth Board of Trade involved in the case of State v. McPhail, 124 Minn. 398, 145 N. W. 108, 50 L.R.A.(N.S.) 255, Ann. Cas. 1915C, 538, we regard that case as controlling on the question here presented. The membership in the traders exchange is a valuable piece of property. It confers a certain standing upon the member and in a measure affects his trading and dealing with livestock in the yard. It passes by purchase, and it has a well understood value in the market. On this branch of the case we affirm the judgment of the trial court.

Judgment modified.